CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED

August 12, 2024

LAURA A. AUSTIN, CLERK
BY: /s/ Robin Bordwine
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **LISA A. STRONG,** | ) | |
| Plaintiff | ) | Civil Action No. 2:23cv00024 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MARTIN J. O'MALLEY,**[1] | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant. | ) | United States Magistrate Judge |
| | ) | |

### *I. Background and Standard of Review*

Plaintiff, Lisa A. Strong, ("Strong"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has requested oral argument; therefore, this case is ripe for decision. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*,

---

[1] Martin J. O'Malley, ("O'Malley"), became the Commissioner of Social Security on December 20, 2023.  Pursuant to Federal Rules of Civil Procedure Rule 25(d), O'Malley should, therefore, be substituted for Kilolo Kijakazi as the defendant in this case.  Pursuant to the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), no further action is required to continue this suit.

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Strong protectively filed applications for DIB and SSI on May 28, 2021, alleging disability as of February 15, 2022,[2] based on depression, anxiety, neck problems, stomach problems, high blood pressure, carpal tunnel syndrome in the right hand, arthritis and chronic obstructive pulmonary disorder, ("COPD"). (Record, ("R."), at 14, 248, 252-53, 259-65, 296.) The claim was denied initially and upon reconsideration. (R. at 124-25, 134-35, 143, 146-47, 156-57.) Strong then requested a hearing before an administrative law judge, ("ALJ"). (R. at 161-62.) The ALJ held a hearing on February 7, 2023, at which Strong was represented by counsel. (R. at 40-67.)

By decision dated February 22, 2023, the ALJ denied Strong's claims. (R. at 14-32.) The ALJ found Strong met the nondisability insured status requirements of the Act for DIB purposes through June 30, 2026.[3] (R. at 16.) The ALJ found Strong had not engaged in substantial gainful activity since February 15, 2022, the amended alleged onset date. (R. at 17.) The ALJ determined Strong had severe impairments, namely, cervical degenerative disc disease; right carpal tunnel

---

[2] Strong initially alleged a disability onset date of February 27, 2021, but later amended it to February 15, 2022, the date of her 50th birthday. (R. at 14.)

[3] Therefore, Strong must show she was disabled between February 15, 2022, the alleged onset date, and February 22, 2023, the date of the ALJ's decision, to be eligible for DIB benefits.

syndrome; COPD/emphysema; osteoarthritis of the knees; sensorineural hearing loss; generalized anxiety disorder; major depressive disorder; and borderline intellectual functioning, but he found Strong did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-21.) The ALJ found Strong had the residual functional capacity to perform light[4] work, except she could occasionally perform postural activities ,but never climb ladders, ropes or scaffolds and frequently handle, finger and feel; she should avoid exposure to loud noise, such as heavy traffic; she should avoid concentrated exposure to pulmonary irritants and industrial hazards; she could understand, remember and apply simple, one- or two-step instructions and perform simple tasks; maintain attention and concentration for two-hour periods; occasionally interact with others; and she would be off task for 10 percent of the workday. (R. at 21.)

The ALJ found Strong was unable to perform any of her past relevant work. (R. at 29.) Based on Strong's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Strong could perform, including the jobs of a marker, a garment sorter and a laundry classifier. (R. at 30-31.) Thus, the ALJ concluded Strong was not under a disability as defined by the Act from the amended alleged onset date of February 15, 2022, through the date of the decision, and she was not eligible for DIB and SSI benefits. (R. at 31.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2023).

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  If someone can perform light work, she also can perform sedentary work.  *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2023).

After the ALJ issued his decision, Strong pursued her administrative appeals, (R. at 241-43), but the Appeals Council denied her request for review. (R. at 1-5.) Strong then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2023). This case is before this court on Strong's motion for summary judgment filed September 28, 2023, and the Commissioner's brief filed November 9, 2023.

## II. Facts

Strong was born in 1972, (R. at 30) which, at the time of her amended onset date, classified her as a "person closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d). Strong testified that she completed the seventh grade and did not obtain a GED. (R. at 45.) She testified that she had prior work experience as nurse aide. (R. at 29-30, 45-46.) Strong testified that she had taken care of her younger sister, who had Down Syndrome and required a high level of assistance with her daily activities. (R. at 45-46.) Strong testified that she had also worked as a direct support professional for adults with intellectual disabilities. (R. at 46.)

Strong testified that she had a history of alcohol abuse, but she had not consumed alcohol since October 2021. (R. at 47-48.) Strong testified that in October of 2021 she was hospitalized due to alcohol use, and her primary care provider initiated her on medication to help with her alcohol cravings. (R. at 47-48.) Strong indicated that this medication helped her, and she had not used alcohol since she began taking medication. (R. at 47-48.)

Strong testified that she stopped working in February 2021 due to pain in her neck and back, as well as carpal tunnel syndrome. (R. at 49.) Strong testified that her carpal tunnel syndrome caused numbness and tingling in both hands, and she was unable to write as required by her job. (R. at 49-50.) Strong testified that, despite surgery on her right hand, her symptoms were not alleviated. (R. at 50.) Strong further testified that she was in a car accident in November of 2021, but she had also been experiencing pain prior to that time that affected her ability to stand and walk. (R. at 50-51.) Strong testified that before her car accident, she could stand and/or walk for 30 minutes at a time before needing to sit, and after her car accident, she could stand and/or walk for only five minutes before needing to sit. (R. at 50-51.) Strong further testified that she had arthritis in both knees, for which she took medication, and she also took medication and received injections for her neck pain. (R. at 51-52.) Strong testified that she currently could not lift more than five pounds. (R. at 54.) Strong testified that she took medications for respiratory issues, including an albuterol nebulizer three times per day. (R. at 55.) Strong testified that she also used a rescue inhaler at least twice a day in between her nebulizer treatments. (R. at 56.) Strong testified that her pain was the primary thing that would prevent her from being able to complete a task. (R. at 56-57.) Strong testified that her back would hurt when she stooped, squatted, bent or knelt. (R. at 57.) She testified that she could not repetitively lift her arms overhead, extended to shoulder level or in front of her at a tabletop level. (R. at 57-59.)

Strong also testified that she had been seeing a counselor at Family Preservation Services for the last year and a half to treat anxiety and depression. (R. at 59.) Strong testified she was prescribed medication through Family Preservation Services for these diagnoses, and she experienced two panic attacks a day that lasted 30 minutes or longer. (R. at 59-60.) Strong testified that her depression caused her to sleep a lot, forget to bathe, cry frequently and either

overeat or not eat. (R. at 61.) She testified that while she took her mental health medications as prescribed, they did not alleviate her symptoms. (R. at 61.)

Tim Woodford, a vocational expert, also was present and testified at Strong's hearing. (R. at 62-66.) Woodford was asked to consider a hypothetical individual of Strong's age, education and work experience, who had the residual functional capacity to perform light exertional work with occasional postural activities, but no ladder, rope or scaffold climbing, who could frequently handle, finger and feel, who should avoid exposure to loud noise, such as heavy traffic and who should avoid concentrated exposure to pulmonary irritants and industrial hazards. (R. at 63.) Further, the hypothetical individual would be able to understand, remember and apply simple, one- or two-step instructions and perform simple tasks, would be able to maintain attention and concentration for two-hour periods and could occasionally interact with others. (R. at 63.) Woodford testified that such a person would not be able to perform Strong's past relevant work based on exertional and skill levels, but that there were other jobs in the national economy that such a person could perform, specifically, those of a marker, a garment sorter and a laundry classifier. (R. at 63-64.)

In rendering his decision, the ALJ reviewed records from Ballad Health Spine and Rehabilitation; Wellmont Medical Associates Spine & Rehab; Dr. Chadi M. Jarjoura, M.D.; Family Preservation Services of Virginia; Dr. Michael Wheatley, M.D.; Wise County Health Department; University of Virginia Health System; Ballad Health Medical Associates Family Medicine; Wellmont Medical Associates; Wellmont Medical Associates Urgent Care; Highlands Neurosurgery; Gastroenterology Associates; Mountain States Medical Group; Mountain Empire Hearing and Balance; Lonesome Pine Hospital; Norton Community Hospital; Howard Leizer, Ph.D., a state agency psychologist; Dr. Cheryl Arenella, M.D., a

state agency physician; Leslie Montgomery, Ph.D., a state agency psychologist; Dr. Robert McGuffin, Jr. M.D., a state agency physician; and Melinda M. Fields, Ph.D.

On May 6, 2021, Strong completed an electromyography, ("EMG"), and nerve conduction study, ("NCS"), for pain, numbness and tingling in her right upper extremity. (R. at 1258.) The study showed evidence consistent with possible mild carpal tunnel syndrome in Strong's right wrist. (R. at 1258.)

On July 12, 2021, Strong saw Dr. Robert Rice, M.D., for evaluation of cervical pain that radiated into her left arm. (R. at 1361-62.) Dr. Rice noted very mild degenerative changes at her C5 and C5 vertebrae with a central disc bulge, and Strong rated her pain as a four out of 10 in severity. (R. at 1361-62.) On physical examination, Strong was alert, followed commands and was in no acute distress; she demonstrated a normocephalic, atraumatic cranium with extraocular movements intact and pupils equal, round and reactive to light; she moved all extremities; her grip was symmetrical; her Hoffman's signs were negative; her reflexes were slightly hypoactive throughout; her toes were down-going, and dorsiflexion and plantar flexion were intact; her gait and station were within normal limits; she showed no signs of any spasticity; her upper and lower extremity strengths were symmetrical at 4/5; she had some tenderness to palpation over the posterior cervical region as well as into the trapezius musculature, bilaterally; she had full range of motion in her shoulders; and her cranial nerves were, otherwise, intact. (R. at 1362.) Dr. Rice recommend physical therapy, as well as range of motion and stretching of the cervical spine and upper extremities along with a cervical epidural block for Strong's back, and he recommended a right carpal tunnel release for her right hand. (R. at 1363.)

On August 6, 2021, Strong had right carpal tunnel release surgery. (R. at 1356.) At a postoperative follow-up visit with the surgeon on August 11, Strong indicated that she had experienced improvement in her carpal tunnel symptoms and that she was pleased with her progress, despite some continued numbness in her right hand. (R. at 1358-59.) On August 23, Strong complained of continued numbness and tingling in her right index finger, and she had recently been to Urgent Care for a suspected infection of the incision site, but otherwise her wound was healing. (R. at 1354-55.) On September 1, Strong again followed up. (R. at 1350.) Strong complained of continued numbness in her right index finger, and there was some incision seperation present on the surgical area, but, otherwise, the wound was healing well. (R. at 1350-51.) On September 22, Strong followed up for a post-operative appointment. (R. at 1348-49.) Strong complained of persistent numbness in her right second finger, but was otherwise pleased with her progress and wound healing. (R. at 1348-49.) Strong rated her pain as a severity of two on a scale of one to 10. (R. at 1349.) On October 6, Strong followed up due to an infection in the surgical area of her hand. (R. at 1346-47.) Strong complained of her right second finger remaining numb since her surgery, but no further interventions were recommended. (R. at 1346.)

On November 8, 2021, Dr. Michael Wheatley, M.D., Strong's primary care provider, completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental). (R. at 1251-53.) Dr. Wheatley opined that Strong was mildly limited in her ability to relate to co-workers, and moderately limited in her ability to follow work rules, to deal with work stresses, to use judgment in public, to interact with supervisors and to function independently. (R. at 1251.) Dr. Wheatley opined that Strong would be markedly limited in her ability to deal with the public and to maintain attention and concentration. (R. at 1251.) Dr. Wheatley opined that Strong was limited in these areas due to her severe anxiety and panic disorder,

because she had trouble making decisions under stress and because she found people difficult to work with. (R. at 1252.) Dr. Wheatley further opined that Strong would have no issues understanding, remembering and carrying out simple job instructions, but she would be moderately limited with complex and detailed job instructions. (R. at 1252.) Dr. Wheatley opined that Strong was limited in these areas because she was frequently distracted and had trouble with her mind racing. (R. at 1252.) Dr. Wheatley opined that Strong had a mild limitation in her ability to maintain personal appearance, a moderate limitation in relating predictably in social situations and in demonstrating reliability, and a marked limitation in her ability to behave in an emotionally stable manner. (R. at 1252.) Dr. Wheatley opined that Strong was limited in these areas because she could not do as well when stressed, she often failed to complete tasks, and she has difficulty controlling her anger at times. (R. at 1253.) Lastly, Dr. Wheatley opined that Strong could manage her own funds and that she would be absent from work for more than two days per month. (R. at 1253, 1256.)

Also on November 8, 2021, Dr. Wheatley completed an Assessment Of Ability To Do Work-Related Activities (Physical). (R. at 1254-56.) Dr. Wheatley opined that Strong could occasionally lift and carry up to eight pounds, and frequently lift and carry up to five pounds. (R. at 1254.) Dr. Wheatley opined that Strong was limited in this way due to her carpal tunnel surgery and because of pain in her lumbar and cervical spine. (R. at 1254.) Dr. Wheatley further opined that Strong could stand or walk a total of three hours in an eight-hour workday, but she could do so for 30 minutes at a time. (R. at 1254.) Dr. Wheatley opined that Strong was limited in this area due to low back pain and muscle spasms. (R. at 1254.) Dr. Wheatley also opined that Strong could sit for two to three hours total in an eight-hour workday, and for 30 minutes without interruption, due to Strong's lumbar disc changes. (R. at 1255.) Dr. Wheatley opined that Strong could never climb, but

occasionally stoop, kneel, balance, crouch and crawl due to cervical spine pain. (R. at 1255.) Dr. Wheatley opined that Strong's ability to reach, to handle, to push and to pull would be affected by her right hand carpal tunnel, but she would not be limited in her ability to feel, to see, to hear and to speak. (R. at 1255.) Dr. Wheatley opined that, due to her frequently exacerbated COPD, Strong would be limited in her ability to be exposed to heights, moving machinery, temperature extremes, chemicals, dust and noise but not to fumes, humidity and vibration. (R. at 1256.)

On January 5, 2022, Strong saw Dr. Wheatley with complaints of hypertension and anxiety. (R. at 1118-19.) On a review of systems, Strong endorsed irritability, anxiety and a dry cough. (R. at 1118, 1121.) Physical examination was unremarkable. (R. at 1122.) Dr. Wheatley adjusted Strong's medications and instructed her to follow up in three months. (R. at 1123-24.)

On February 15, 2022, Strong saw Melissa Dibble, F.N.P., a nurse practitioner at Family Preservation Services, for outpatient medication management. (R. at 1206.) Strong had been treating with Dibble since at least May 2021 for major depressive disorder that was moderate with anxious distress. (R. at 619.) At this appointment, Strong told Dibble she had "been better," and her depression had been getting worse over the last few weeks. (R. at 1206.) Strong indicated she had been sleeping more, about 10 hours per day, and her primary care provider had recently initiated her on propranolol for restless legs. (R. at 1206.) Strong endorsed abnormal sleep, anxious and depressed mood and moderate functional impairment. (R. at 1206-07.) Dibble increased Strong's Pristiq dosage. (R. at 1208.)

On February 21, 2022, Strong saw Dr. Chadi M. Jarjoura, M.D., for management of severe cramping and pelvic pain. (R. at 1232.) Strong endorsed painful intercouse and pelvic pain. (R. at 1236.) Physical examination was unremarkable except for pelvic pain. (R. at 1236-37.) Dr. Jarjoura referred Strong to a gastroenterologist for a consultation and discussed a potential hysterectomy with Strong. (R. at 1238-39.)

On March 2, 2022, Strong saw Dr. Wheatley for neck pain and right knee pain. (R. at 1275.) Strong described her neck pain as constant, gradually worsening, and beginning after a motor vehicle accident. (R. at 1275.) She stated that the pain was present in both the left and right side and was aching, aggravated by twisting and positioning, stiff all day and was a severity of five on a scale of one to 10. (R. at 1275.) Strong described her knee pain as starting three to five days previously and not being related to an injury. (R. at 1275.) She described aching, worsening pain that was a severity of five on a scale of one to 10, was aggravated by weight bearing and movement and moderately relieved with the use of NSAIDS and nonweight bearing. (R. at 1275.) Strong endorsed neck pain, but denied other symptoms, and physical examination was unremarkable. (R. at 1279-80.) Dr. Wheatley performed trigger point injections for Strong's neck pain, and he instructed Strong to follow up with pain management. (R. at 1281-82.) Dr. Wheatley also ordered imaging for Strong's knee pain, which showed no significant degenerative changes and no acute osseous findings. (R. at 1281, 1330.) For Strong's generalized anxiety disorder, chronic airway obstruction, esophageal reflux and hypertension, Dr. Wheatley noted that Strong was taking her relevant medications as prescribed and that she wished to continue her current therapy for these ailments. (R. at 1281.)

On March 3, 2022, Strong saw Michelle L. Painter, N.P., a nurse practitioner, for neck pain. (R. at 1262.) Strong described her neck pain as throbbing, stabbing, stiff and aggravated by long periods of standing or sitting. (R. at 1262.) Strong further described the pain as radiating down her left upper extremity to the elbow, and it was a severity of five on a scale of one to 10. (R. at 1262.) Strong stated that bed rest, ice and analgesics provided mild relief. (R. at 1262.) Abnormal physical examination findings consisted of right-sided muscle tenderness in the cervical spine, abnormal extension and flexion, decreased biceps reflexes of 2/4 and decreased sensation in the left upper extremity to the elbow and the right fingers. (R. at 1265-66.) Painter diagnosed Strong with bulging of her cervical intervertebral disc for which Painter recommended epidural steroid injections, and with which Strong agreed to proceed (R. at 1266.)

On March 15, 2022, Strong saw Dibble for medication management. (R. at 1386.) Strong felt that her anxiety had increased due to health problems, resulting in more medical appointments, which, in turn, caused her anxiety and resulting in her canceling her appointments. (R. at 1386.) Strong felt that the increased dose of Pristiq had not helped alleviate her mental health symptoms. (R. at 1386.) Strong endorsed abnormal sleep, partial insight, anxious and depressed mood and moderate functional impairment. (R. at 1386-87.) Dibble continued the increased Pristiq dose, added hydroxyzine for situational anxiety, and she referred Strong to therapy. (R. at 1388.)

On March 30, 2022, Strong saw Dr. R. Douglas Strickland, M.D., a gastroenterologist, to follow up on the referral from Dr. Jarjoura for cramping and lower abdominal pain. (R. at 1364.) Physical examination was positive for soft mild tenderness in the lower abdomen and a faint wheeze during auscultation. (R. at 1366.) Dr. Strickland ordered a colonoscopy. (R. at 1366.)

On April 13, 2022, Strong followed up with Dibble at Family Preservation Services for continued medication management. (R. at 1389.) Strong reported that she continued to miss medical appointments due to anxiety, but hydroxyzine had been helpful. (R. at 1389.) Strong endorsed increased sleep, partial insight, anxious and depressed mood and moderate functional impairment. (R. at 1389-90.) Dibble continued Strong on the same medications and referred her to therapy. (R. at 1391.)

On April 19, 2022, Strong saw Dr. Wheatley for a follow up on her knee pain and sinus problems. (R. at 1286.) Strong indicated that her knee pain had increased from the previous to a six on a scale of one to 10. (R. at 1286.) Strong indicated that the neck injection from the previous appointment relieved her symptoms and improved her range of motion for two weeks. (R. at 1286.)  Strong denied other pertinent symptoms and physical examination was unremarkable. (R. at 1290.) Dr. Wheatley increased Strong's dose of the medication he had prescribed to treat her knee. (R. at 1291-92.)

On May 11, 2022, Strong saw Dr. Wheatley to be cleared for a colonoscopy and to receive an epidural steroid injection. (R. at 1298.) A physical examination yielded normal findings. (R. at 1302.)  Dr. Wheatley ordered lab work at this visit, and he diagnosed neuropathy caused by toxin; generalized anxiety disorder; hypersomnolence; restless legs syndrome; simple chronic bronchitis; gastroesphogeal reflux disease without esophagitis; essential hypertension; and lumbar disc disease. (R. at 1305, 1307.) Chest imaging conducted on May 13 to screen for lung cancer reveaed mild centrilobular emphysema, and numerous, small, peripheral calcified and noncalcified pulmonary nodules. (R. at 1328.) The interpreting radiologist noted that the latter finding likely represented the sequela

-13-

of chronic granulomatous disease, and given the presence of a noncalcified nodule within the superior segment of the right middle lobe, recommended considering follow-up imagining of the thorax in six to 12 months. (R. at 1328.) The radiologist also strongly advised smoking cessation. (R. at 1328.)

On June 7, 2022, Strong followed up with Dibble at Family Preservation Services for medication management. (R. at 1392.) Strong cited her mother's medical issues as a stressor, but said that her mood had, overall, been stable, and her anxiety currently was her main mental health symptom. (R. at 1392.) Strong endorsed abnormal sleep, partial insight, anxious and depressed mood, and moderate functional impairment. (R. at 1392-93.) Dibble increased Strong's hydroxyzine dose and referred her to therapy. (R. at 1394.)

On June 22, 2022, Strong underwent a colonoscopy, during which a small polyp was found and completely removed. (R. at 1369.) Pathology results showed that Strong had a tubular adenoma. (R. at 1371.) Strong tolerated the procedure well and was told to have a repeat colonoscopy in five years. (R. at 1369.)

On July 5, 2022, Strong followed up with Dibble at Family Preservation Services for medication management. (R. at 1395.) Strong felt that the increased hydroxyzine dose made her dizzy, but said that her mood was stable, and she denied other medication side effects and was eating and sleeping well. (R. at 1395.) Strong endorsed abnormal sleep, partial insight, anxious and depressed mood and moderate functional impairment. (R. at 1395-96.) Dibble increased Strong's hydroxyzine and referred her to therapy. (R. at 1397.)

On July 7, 2022, Strong saw Dr. Wheatley for peripheral neuropathy caused by toxin and back pain. (R. at 1308.) Strong described moderate, nonradiating,

lumbar back pain, which was worse during the day and aggravated by bending and positioning, with stiffness at night. (R. at 1308.) She indicated that NSAIDS provided moderate relief, and she denied alcohol usage at that time. (R. at 1308.) Strong denied other symptoms, and a physical examination was normal. (R. at 1311-13.) Dr. Wheatley performed trigger point injections for Strong's back pain, which she tolerated well. (R. at 1314-15.)

On July 12, 2022, Strong saw Dr. Deneene R. Doyker Booth, M.D., for her second epidural steroid injection for cervical radiculopathy (R. at 1273-74.) Strong tolerated the procedure well, and there were no complications. (R. at 1273.)

On July 28, 2022, Strong saw L. Brooke Swiney, F.N.P., a nurse practitioner, for knee pain. (R. at 1319.) Strong indicated that the pain had begun five to seven days prior, was in the left and right knee and was moderately severe. (R. at 1319.) She said that the pain had been fluctuating since onset, was associated with a loss of motion, was aggravated by movement and weight bearing, and ice and acetaminophen provided no relief. (R. at 1319.) Physical examination was positive for swelling in the left and right knees that was not accompanied by deformity, effusion, erythema, ecchymosis, bony tenderness or tenderness. (R. at 1323.) Swiney ordered uric acid testing to rule out a gout diagnosis, completed a muscle injection, added a medication for the knee pain, and she told Strong to make an appointment for a joint injection or with an orthopedic doctor if her symptoms did not improve. (R. at 1324.)

On August 1, 2022, Dr. Jarjoura saw Strong for a follow up on pelvic pain. (R. at 1331.) After Strong consulted with gastroenterology, she continued to have pelvic pain and cramping, mildly relieved by naproxen. (R. at 1331.) Strong denied any other complaints or concerns, and physical examination was unremarkable. (R.

at 1331, 1335.) Dr. Jarjoura scheduled a laparoscopy with possible fulguration[5] of endometriosis due to Strong's pelvic pain not responding to conservative treatment. (R. at 1331, 1336.)

On August 4, 2022, Strong followed up with Dibble at Family Preservation Services for medication management. (R. at 1398.) Strong said that she had been doing okay, she had increased her hydroxyzine dose on her own, her mood had been stable, but she had ongoing anxiety. (R. at 1398.) Strong further endorsed abnormal sleep, partial insight, anxious and depressed mood and moderate functional impairment. (R. at 1398-99.) Dibble increased Strong's nortriptyline dose and referred her to therapy. (R. at 1400.)

On August 29, 2022, Strong underwent a hearing test, which showed mild to moderate sensorineural hearing loss, bilaterally. (R. at 1372.) The performing audiologist recommended bilateral amplification to assist Strong with hearing and participating in conversations. (R. at 1372.) On September 14, 2022, Strong was fitted with bilateral hearing aids. (R. at 1417.)

On October 5, 2022, Strong saw Dibble at Family Preservation Services for continued medication management. (R. at 1401.) Strong reported that she had been okay, but she had been unable to sleep, which she believed to be due to menopause, and she had been experiencing some ongoing depressive symptoms. (R. at 1401.) Strong endorsed abnormal sleep, partial insight, an anxious and depressed mood and moderate functional impairment. (R. at 1401-02.) Dibble

---

[5] Fulguration is a type of endometriosis surgery which the lesions that are present outside of the uterus are burnt away. Fulguration is also called ablation. See https://verywellhealth.com/fulgeration-of-endometriosis-vs-excision-6500766 (last visited Aug. 8, 2024).

referred Strong to therapy and added Remeron to her medication regimen. (R. at 1403.)

On October 6, 2022, Strong saw Dr. Wheatley for COPD and depression. A depression screening indicated mild depression. (R. at 1422.) Regarding her COPD, Strong endorsed mild symptom severity and said she felt relief with an inhaler. (R. at 1422.) Strong denied all other symptoms, and physical examination was unremarkable. (R. at 1426-27.) Dr. Wheatley referred Strong to physical therapy and gynecology for her osteoarthritis and history of abnormal PAP test. (R. at 1428-29.) Dr. Wheatley noted that Strong's alcohol withdrawal, essential hypertension, esophageal reflux, chronic airway obstruction and generalized anxiety disorder all were sufficiently controlled at that time. (R. at 1428-29.)

On October 28, 2022, Strong underwent psychological testing with Melinda Fields, Ph.D., to determine her current adjustment pattern and to assist with a diagnostic determination. (R. at 1409-16.) Strong agreed to participate in the evaluation, felt she understood the purpose of it, and she was considered a reliable historian. (R. at 1409.) Regarding her mental health history, Strong said that she had been hospitalized twice at the Life Center for alcoholism, with the last hospitalization occurring in her early 30s. (R. at 1411.) She stated that she had not consumed alcohol for the last year and a half. (R. at 1411.) Strong said that she had seen a therapist two to three times approximately one and a half years previously, and she had been treating with Family Preservation Services for the last year. (R. at 1411.) Strong reported that her depression symptoms had begun approximately 20 years earlier, and her initial anxiety-related symptoms 10 years previously. (R. at 1411.) Strong reported the death of her father in 2019 to have contributed to the severity of her symptoms, and she reported having a depressed mood daily with tearfulness and feelings of hopelessness and worthlessness. (R. at 1411.) She

reported losing interest in activities that she previously enjoyed, experiencing excessive guilt, difficulty concentrating and making decisions and irritability. (R. at 1411.) She reported inconsistent sleep and appetite, with mildly fluctuating weight, but denied suicidal and homicidal ideations and hallucinations. (R. at 1411.) Strong reported feeling chronic worry and rumination that led her to isolate herself. (R. at 1411.) Strong said that when she was nervous, she would get shaky and sweaty, and she would experience "anxiety attacks," characterized by a rapid heart rate, chest pain, difficulty breathing, lightheadedness, fearfulness, abdominal discomfort and numbness and tingling in her left arm. (R. at 1412.)

Strong reported attending school through the seventh grade, but was unsure if she received special education services. (R. at 1412.) She stated she obtained her driver's license with the assistance of her father, who read the test to her and gave her answers, and she was able to drive herself short distances. (R. at 1412.) Strong recounted her previous work history, noting that her direct support professional job caused strain on her neck and back. (R. at 1412.) Strong described her activities of daily living to include rising and retiring at various times due to sleep problems, watching television and visiting daily with her mother, who lives in the same apartment building. (R. at 1412-13.) Strong stated that she had been with her boyfriend since 2015, and he visited two to three times per week and paid her bills. (R. at 1412.) Strong stated that she was responsible for household chores, but had to sit to wash dishes, prepared convenience foods, and she had "some trouble" counting money. (R. at 1412-13.) Fields noted that Strong's posture appeared stiff, her gait appeared to be within normal limits, and she had adequate grooming and hygiene. (R. at 1413.) Strong's mood appeared depressed and anxious, and her judgment appeared impaired. (R. at 1413.) Strong's immediate memory appeared adequate, but her recent and remote recall appeared impaired, and she was unable

to spell "world" in reverse order. (R. at 1413.) Fields also noted deficits in Strong's concentration. (R. at 1413.)

Fields administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), to ascertain intellectual functioning, on which Strong received a full-scale IQ score of 70, placing her in the borderline range of intellectual functioning. (R. at 1413-14.) Fields also administered the Wide Range Achievement Test – Fifth Revision, ("WRAT5"), to ascertain achievement function in the areas of reading, written expression and arithmetical skills. (R. at 1414.) Here, Strong tested within the 1st to 10th percentiles in all areas assessed. (R. at 1415.) Lastly, Fields completed the Beck Depression Inventory, ("BDI"), and the Beck Anxiety Inventory, ("BAI"), with results suggestive of significant depressive symptomatology and significant anxiety-related symptoms. (R. at 1415.) Fields diagnosed Strong with major depressive disorder; generalized anxiety disorder; panic disorder; alcohol disorder, by history, by report; and borderline intellectual functioning. (R. at 141.) She concluded that Strong required ongoing involvement in outpatient psychiatric treatment and that psychotherapy was strongly indicated to reduce and stabilize the presentation of psychiatric symptoms. (R. at 1415-16.)

Fields also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) for Strong on October 28, 2022. (R. at 1406-08.) Fields opined that Strong would be moderately limited in her ability to follow work rules and to interact with supervisors. (R. at 1406.) Fields opined that Strong would have a marked limitation in her ability to relate to co-workers, to deal with the public and work stressors, to use judgment in public, to function independently and to maintain attention and concentration. (R. at 1406.) Fields opined that Strong was limited in these areas due to impaired judgment, social functioning, concentration

and recent and remote recall, as well as anxiety and borderline intellectual functioning. (R. at 1407.) Fields further opined that Strong was moderately limited in her ability to understand, remember and carry out simple job instructions. (R. at 1407.) Fields opined that Strong was markedly limited in her ability to understand, remember and carry out detailed and complex job instructions. (R. at 1407.) Fields opined that Strong was limited in these areas due to borderline intellectual functioning, as well as impaired concentration and recent and remote recall. (R. at 1407.) Fields opined that Strong would be mildly limited in her ability to maintain personal appearance, moderately limited in her ability to demonstrate reliability, and she would be markedly limited in her ability to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 1407.) Fields opined that Strong's limitations in these areas were due to impaired social functioning, panic symptoms and depressive symptoms. (R. at 1407.) Lastly, Fields opined that Strong was able to manage benefits in her own best interest, and she would be absent from work more than two days per month. (R. at 1408.)

On November 22, 2022, Strong followed up on Dr. Wheatley's physical therapy referral and was assessed at Norton Community Hospital's physical therapy outpatient center. (R. at 1435.) Strong was observed to have limitations in balance, gait, proprioception, range of motion and strength and was recommended to have two physical therapy sessions for up to six weeks to improve her functional abilities. (R. at 1438.) Strong presented with globally impaired range of motion in her cervical and lumbar spine, but her rehab potential was said to be good if she was compliant with a home exercise program and plan of care. (R. at 1437-38.) Strong attended one physical therapy appointment on December 6, 2022. (R. at 1430-43.) If Strong attended more appointments, they are not present in the record.

Also on November 22, 2022, Strong saw Dibble at Family Preservation Services for continued medication management. (R. at 1442.) Strong stated that she had been more depressed and anxious recently, and she had begun physical therapy that day which caused her anxiety to be increased. (R. at 1442.) Strong said that the Remeron Dibble had prescribed for sleep had not helped much, but she denied any medication side effects. (R. at 1442.) Strong endorsed abnormal sleep, partial insight, anxious and depressed mood and moderate functional impairment. (R. at 1442-43.) Dibble increased Strong's dose of Remeron and Pristiq and referred Strong to therapy. (R. at 1444.)

On December 22, 2022, Strong saw Dibble at Family Preservation Services for continued medication management. (R. at 1445.) Strong reported that her mood and anxiety had improved with the increased Pristiq dose, but her anxiety was higher due to the holidays. (R. at 1445.) Strong endorsed continued disrupted sleep, partial insight, anxious and depressed mood and moderate functional impairment, but she denied any medication side effects. (R. at 1445-46.) Dibble discontinued Strong's Remeron and added doxepin for sleep, and she referred her to therapy. (R. at 1447.)

On January 26, 2023, Strong saw Dr. Jarjoura, her gynecologist, to follow up on pelvic pain. (R. at 1455.) Dr. Jarjoura had scheduled Strong for a laparoscopy, but it was not performed. (R. at 1455.) Strong denied symptoms other than pelvic pain, and physical examination was unremarkable except for this finding. (R. at 1455.) Dr. Jarjoura rescheduled Strong for a laparoscopy with fulguration of endometriosis due to persistent pelvic pain despite conversative treatment. (R. at 1461.)

On January 30, 2023, Strong presented to Norton Community Hospital's emergency department with complaints of neck pain. (R. at 1484.) Strong described the pain as left-sided and radiating to the back of her head, and she said it had begun two days prior. (R. at 1488.) Strong complained of nausea, myalgias, neck pain and stiffness and headaches. (R. at 1486.) Physical examination revealed general musculoskeletal tenderness and cervical tenderness, but was, otherwise, normal. (R. at 1486.) Imaging was performed and showed no acute findings, but mild to moderate disc space narrowing at the C6-C7 level was noted. (R. at 1489.) Strong responded to pain relievers provided at the emergency department and was discharged the same day with instructions to follow up with her primary care provider. (R. at 1488.)

On January 13, 2022, Howard Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), in connection with the initial determination of Strong's claims and based on her initial alleged onset date. (R. at 84.) Leizer found that, due to Strong's history of depression, anxiety and alcohol abuse, she would be moderately limited in her ability to interact with others and to concentrate, persist or maintain pace, but she was not limited in her ability to adapt or manage herself or to understand, remember or apply information. (R. at 84.) Leizer found that Strong could be expected to perform simple, unskilled work. (R. at 84.)  Leizer also completed a Mental Residual Functional Capacity evaluation, finding Strong had no memory limitations or adaption limitations. (R. at 87-88.) However, he found she had certain social interaction and sustained concentration and persistence limitations. (R. at 88.) Specifically, Leizer opined that, due to impaired concentration and consistent anxiety symptoms, Strong could perform only very short, simple, one- or two-steo instructions and she would have occasional difficulties maintaining attention and concentration for extended periods. (R. at 88.) Due to irritability stemming from

depression and anxiety, she would have occasional difficulties working in coordination with or in proximity to others without being distracted by them; and she would have occasional interruptions from psychologically based symptoms, but could complete a normal workday and workweek. (R. at 88.) Leizer further specifically found that, due to irritability and persistent anxiety symptoms, Strong would have occasional difficulties interacting appropriately with the general public and getting along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 88.) Leizer concluded that Strong was able to respond appropriately to interpersonal demands of simple, repetitive taks with limited contact. (R. at 88.)

On  the same day, Dr. Cheryl Arenella, M.D., a state agency physician, completed a Physical Residual Functional Capacity evaluation, also in connection with the initial determination of Strong's claims. (R. at 85-87.) Dr. Arenella found that Strong could perform light work, but should avoid concentrated exposure to respiratory irritants due to her history of COPD. (R. at 86.)

On reconsideration, Leslie Montgomery, Ph.D., a state agency psychologist, also completed a PRTF, dated March 1, 2022, using Strong's initial alleged onset date of disability. (R. at 96-97.) Montgomery found that Strong would be moderately limited in her ability to understand, remember or apply information; to interact with others; and to concentrate, persist or maintain pace; but she found that Strong was not limited in her ability to adapt or manage herself. (R at 97.) Montgomery concluded that Strong could perform simple, repetitive tasks. (R. at 7.) That same day, Montgomery also completed a Mental Residual Functional Capacity evaluation of Strong, opining she would not be able to understand and remember detailed instructions due to limitations in concentration with depression and anxiety, but she remained able to understand and remember one- to two-step

instructions and simple work procedures. (R. at 100-01.) Montgomery further opined that Strong may have interruptions in completing work periods or timely attendance, but could attend to simple tasks for two-hour periods with usual breaks and occasional interruptions. (R. at 100.) She opined Strong's anxiety and depression limited her ability to respond appropriately to change, and she could interact adequately with others to complete simple work duties in a setting with low social demands. (R. at 101.) Montgomery concluded that Strong remained capable of simple, repetitive tasks. (R. at 101.)

Also on reconsideration, Dr. Robert McGuffin, Jr, M.D., a state agency physician, completed a Physical Residual Functional Capacity evaluation on March 8, 2022, finding that Strong could perform light work, but should avoid concentrated exposure to pulmonary irritants due to her history of COPD. (R. at 98-100.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2023). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2023).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A) and § 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Strong's sole argument is that substantial evidence does not support the ALJ's residual functional capacity finding because the ALJ erred in finding the opinions of Dr. Wheatley and Melinda Fields, Ph.D., to be unpersuasive. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgement, ("Plaintiff's Brief"), at 5-6.)

Strong filed her applications in May 2021; thus, 20 C.F.R. §§ 404.1520c, 416.920c govern how the ALJ considered the medical opinions here.[6] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2023). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. §§ 404.1520c(b), (c)(1)-(5), 416.920c(b), (c)(1)-(5) (2023) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2023).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in

---

[6] 20 C.F.R. § 404.1520c and 20 C.F.R. § 416.920c apply to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[7] *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a) (2023). The ALJ found Strong had the residual functional capacity to perform light work, except she could occasionally perform postural activities, but never climb ladders, ropes or scaffolds; she could frequently perform handling, fingering and feeling; she should avoid concentrated exposure to loud noise, such as heavy traffic; she should avoid concentrated exposure to pulmonary irritants and industrial hazards; she could understand, remember and apply simple, one- or two-step instructions and perform simple tasks; she could maintain attention and concentration for two-hour periods; she could occasionally interact with others; and she would be off task for 10 percent of the workday. (R. at 21.)

In making his residual functional capacity finding, the ALJ found Dr. Wheatley and Fields's opinions to be unpersuasive. (R. at 28-29.) Strong argues that the ALJ's finding is not supported by substantial evidence, and Dr. Wheatley and Fields's opinions are supported by "objective observations, examinations, and testing." (Plaintiff's Brief at 6.)

---

[7] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3) (2023).

Dr. Wheatley, Strong's primary care provider, completed an Assessment Of Ability To Do Work-Related Activities (Physical), on November 8, 2021. (R. at 1254-56.) On this form, Dr. Wheatley opined that Strong could lift eight pounds occasionally and five pounds frequently, due to her recent carpal tunnel surgery and pain in her lumbar and cervical spine. (R. at 1254.) Dr. Wheatley further opined that Strong could stand and/or walk a total of three hours in an eight-hour workday, and could do so for 30 minutes at a time. (R. at 1254.) Dr. Wheatley opined that Strong was so limited due to her low back pain and muscle spasms. (R. at 1254.) Dr. Wheatley opined that Strong could sit for two to three hours in an eight-hour workday, and for 30 minutes uninterrupted, due to her lumbar disc changes. (R. at 1255.) Dr. Wheatley further opined that Strong could never climb, but could occasionally stoop, kneel, balance, crouch and crawl. (R. at 1255.) Dr. Wheatley opined that, due to Strong's right hand carpal tunnel, she would be limited in her ability to reach, to handle and to push/pull, but not in her ability to feel, to see, to hear or to speak. (R. at 1255.) Dr. Wheatley opined that, due to her frequently exacerbated COPD, Strong would be limited in her ability to be exposed to heights, moving machinery, temperature extremes, chemicals, dust and noise, but not to fumes, humidity and vibration. (R. at 1256.) Lastly, Dr. Wheatley opined that Strong's physical limitations would cause her to be absent from work more than two days per month. (R. at 1256.)

Regarding Dr. Wheatley's physical, exertional limitations, the ALJ pointed out that Dr. Wheatley did not adequately explain how Strong's carpal tunnel surgery, back pain and back spasms would require such restrictive limitations. (R. at 28.) The ALJ also referenced the relatively conservative management of Strong's symptoms since 2022. (R. at 28.) Lastly, the ALJ referred to recent imaging of the cervical spine that showed mild to moderate degenerative changes,

but no acute osseous abnormality. (R. at 28.) The ALJ found Dr. Wheatley's opinion to be unpersuasive, because the "limited rationale provided in the form-based assessment does not justify the extreme limitations suggested therein." (R. at 28.) For the reasons that follow, I agree.

On November 22, 2022, at the recommendation of Dr. Wheatley, Strong underwent a physical therapy evaluation which identified back and neck pain that was exacerbated by prolonged sitting and standing. (R. at 1437.) Strong's physical therapist recommended that Strong attend two sessions per week for up to six weeks, stating that Strong's "[r]ehab potential . . . is good if patient is compliant with home exercise program and plan of care." (R. at 1438.) However, despite this positive prognosis, Strong attended only one physical therapy session and continued to manage her pain conservatively with medications. (R. at 1430-34.)

At a post-operative visit following her carpal tunnel surgery, Strong's surgeon noted that her symptoms remained "much improved except for persistent numbness in the [right] second finger," and he did not suggest a follow-up surgery, physical therapy or any other treatment to address this symptom. (R. at 1348.)

Dr. Wheatley opined that Strong's exposure to environmental hazards should be limited due to her history of COPD. (R. at 1256.) The ALJ accounted for Strong's pulmonary impairments in his residual functional capacity finding by restricting her from concentrated exposure to pulmonary irritants. (R. at 21.) A more severe limitation is not supported by substantial evidence of record. For example, while Strong was diagnosed with COPD, she managed her symptoms with nebulizers and inhalers. (R. at 1298, 1314) During the time period relevant to her claims, Strong was smoking about one pack of cigarettes per day, and she indicated that she did not want to quit, suggesting that her COPD was effectively

managed by her medications. (R. at 1292, 1298, 1355, 1428) Additionally, lung cancer screening conducted on May 13, 2022, showed mild centrilobular emphysema and changes related to chronic smoking, but no acute abnormalities were visualized. (R. at 1328.)

For the foregoing reasons, I find that substantial evidence supports the ALJ's determination that Dr. Wheatley's opinion is unpersuasive.

Dr. Wheatley also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on November 8, 2021. (R. at 1251-53.) Dr. Wheatley opined that Strong would be markedly limited in her ability to deal with the public; to maintain attention and concentration; and to behave in an emotionally stable manner. (R. at 1251-52.) For all other areas, Dr. Wheatley opined that Strong either had no limitation, or her limitation was mild or moderate. (R. at 1251-52.) The form that Dr. Wheatley used indicated that a "marked" limitation would result in an unsatisfactory work performance, and a "moderate" limitation indicated more than a slight limitation in the area, but the individual still would be able to function satisfactorily. (R. at 1251.) Dr. Wheatley further opined that Strong would be absent from work more than two days per month and that her limitations began more than 20 years previously. (R. at 1253.)

The ALJ stated that the mental limitations Dr. Wheatley suggested are not supported by his own treatment notes, such as an October 2022 depression screening that showed only mild depression, and the lack of any new treatment suggested for Strong's mental impairments, which were managed in an outpatient setting. (R. at 29, 1422.) Further, the ALJ points out that, while Dr. Wheatley claimed that Strong's limitations began more than 20 years ago, she was able to maintain substantial gainful activity until only recently. (R. at 29.) Lastly, the ALJ

points to largely normal mental status examinations performed by Dr. Wheatley and by Dibble. (R. at 29.) Thus, the ALJ also found that the suggested disabling limitations were inconsistent with the record. (R. at 29.)

Additionally, Strong's treatment for her mental health conditions suggest that her symptoms were controlled with conservative management. While Strong was diligent in attending her medication management appointments with Dibble, there is no indication that she also received therapy, which Dibble recommended in seventeen out of eighteen appointments. (R. at 622, 626, 930, 933, 936, 1205, 1208, 1382, 1385, 1388, 1391, 1394, 1397, 1400, 1403, 1444, 1447.)

The ALJ found Dr. Wheatley's medical opinion regarding Strong's mental functioning to be unsupported by his own treatment notes, inconsistent with the record and unpersuasive. (R. at 28-29.) For the reasons above, I agree with the ALJ.

Strong next argues that the ALJ erred in finding Fields's opinion to be unpersuasive. (Plaintiff's Brief at 6; R. at 29.) Fields's medical assessment was completed in conjunction with a consultative examination performed in October 2022. (R. at 1406-16.) Fields opined that Strong had a "marked" limitation in six out of eight areas of her ability to make occupational adjustments, in two out of three areas of her ability to make performance adjustments and in two out of four areas of her ability to make personal and social adjustments. (R. at 1406-07.) A "marked" limitation is defined on the assessment form as having a "substantial loss in the ability to effectively function… resulting in unsatisfactory work performance." (R. at 1406.) Fields also opined that Strong would be absent from work more than two days a month. (R. at 1408.) The ALJ stated that Fields's opinion seemed somewhat supported by her own findings from the evaluation,

including a borderline IQ score, low scores on academic testing, Strong's anxiety and depression and her impaired judgement, recent and remote memory and concentration. (R. at 29.) However, the ALJ found that Fields's opinion was inconsistent with mental status examinations by Strong's medical providers, including her regular mental health provider. (R. at 29.) Accordingly, the ALJ found that Fields's opinion was unpersuasive. (R. at 29.)  For the reasons that follow, I agree.

Fields's ultimate opinion was that ongoing involvement in outpatient psychiatric treatment and psychotherapy appeared "strongly indicated to reduce and stabilize presentation of psychiatric symptoms." (R. at 1416.) Strong's prognosis, "with appropriate treatment and environmental support," was guarded. (R. at 1415.) While Strong regularly engaged in medication management with her mental health provider, there is no indication in the record that Strong attended therapy as recommended by her provider at nearly every single appointment. (R. at 622, 626, 930, 933, 936, 1205, 1208, 1382, 1385, 1388, 1391, 1394, 1397, 1400, 1403, 1444, 1447.) Nonetheless, Strong's mental status examinations were mostly normal, and Dibble followed Strong only on a monthly basis. (R. at 619-20, 623-24, 627-28, 1203-04, 1206-07, 1380-81, 1383-84, 1386-87, 1389-90, 1392-93, 1395-96.) Accordingly, I find that substantial evidence exists to support the ALJ's consideration of Fields's opinion.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Strong was not disabled under the Act and was not entitled to SSI and DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Strong's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    August 12, 2024.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE